[No. B206789. Second Dist., Div. Five. Feb. 25, 2009.]

ANSCHUTZ ENTERTAINMENT GROUP, INC., et al., Plaintiffs and Respondents, v.
FRANK W. SNEPP III et al., Defendants and Appellants.

**COUNSEL**

Bostwick & Jassy, Gary L. Bostwick and Jean-Paul Jassy for Defendants and Appellants.

Strook & Strook & Lavan, Barry B. Langberg, Deborah Drooz and Michael J. Niborski for Plaintiffs and Respondents.

**OPINION**

**TURNER, P. J.—**

## I.  INTRODUCTION

■     Civil Code section 48a, subdivision 1 provides that a "[p]laintiff," in order to recover general damages in a defamation case, must serve a retraction demand. What happens when a "plaintiff" is not named in the

retraction demand? Can the plaintiff recover actual damages because a wholly owned subsidiary is identified as the party demanding retraction? We conclude that in order for a valid Civil Code section 48a, subdivision 1 retraction demand to preserve the right to pursue general damages, the plaintiff must be actually named or so described that the media defendant fairly knows who is objecting to the challenged publication. As we shall explain, merely identifying a wholly owned subsidiary who it is commonly known is owned by a potential plaintiff in a retraction demand does not comply with the statutory language and purposes embodied in Civil Code section 48a, subdivision 1.

Defendants, Frank W. Snepp III, NBC Universal, Inc., and NBC Subsidiary (KNBC-TV), Inc. (the station), appeal after their special motions to strike two complaints filed by plaintiffs, Anschutz Entertainment Group, Inc. (the group), and its subsidiary L.A. Arena Company LLC (the arena owner), were denied. We reverse the order denying the special motion to strike as to all of the group's claims in the second complaint filed June 14, 2007. Upon remittitur issuance, the special motion to strike the second complaint is to be granted as to the group. The trial court is to apportion the amount of the attorney fees due to defendants incurred litigating the group's defamation claims in the second complaint filed June 14, 2007. The order denying the special motion to strike is affirmed in all other respects.

## II. THE COMPLAINTS AND THE ANSWER TO THE FIRST COMPLAINT

### A. The First Complaint and Answer

On May 9, 2007, plaintiffs filed their slander complaint against defendants. The arena owner owns Staples Center (the arena) in Los Angeles. Between December 15 and 18, 2006, "[d]efendants" repeatedly broadcast a segment that touted an "exclusive investigation" concerning the arena. The segment began with an exterior shot of the arena and its familiar red sign. The first complaint then alleges in paragraph 9: "The camera then zoomed in to focus on visitors strolling calmly around the building. Moments later, viewers heard a menacing voice posing the question: *'But when you go inside STAPLES Center, are you safe?'* The question was immediately answered with the ominous phrase, *'It isn't fire that kills the people. It's the smoke.'* A fraction of a second later, viewers heard an explosion and saw tongues of fire fill the screen. The next image was a sustained shot of dense black billowing smoke. Viewers then heard the words, *'We knew that the fire systems weren't working.'* After a montage of slamming fire doors and close-ups of a 'fire

control panel,' the final alarm was sounded with the phrase, *'Paul Moyer uncovers documents that will make you ask: What would really happen if a fire broke out?'* " (Original boldface and italics.) The purpose of the segment was to have viewers understand the arena is unsafe and likely to undergo a major conflagration.

The foregoing was alleged to be defamatory per se because it conveyed the false messages that the arena is likely to experience a conflagration because of inadequate fire safety systems; the arena is not currently safe for use as an entertainment venue and visitors are exposed to the likelihood of a serious fire while occupying the arena. Plaintiffs further allege: the promotional segment subjected them to obloquy, contempt, hatred, and ridicule and had a tendency to injure their business; the broadcast was aired with actual malice and ill will, knowledge the contents were false, and with a reckless disregard for the truth; and plaintiffs had served a retraction demand but defendants had failed to correct or retract the untrue allegations in the first complaint. Attached as an exhibit to the first complaint is a compact disc video of the promotional segment. Plaintiffs sought general, special, and exemplary damages.

On June 13, 2007, defendants answered the first complaint. The answer consisted of a general denial and various affirmative defenses: plaintiffs were not damaged; the challenged statements were privileged by the United States and California Constitutions; the alleged defamatory statements were "protected" because they were newsworthy; the broadcasts were privileged accounts pursuant to Civil Code section 47, subdivision (d) because they were true and fair accounts of public documents and official proceedings; the complained of statements were privileged fair comment on matters of public interest; plaintiffs' claims were barred by the doctrines of "in pari delicto," unclean hands, and estoppel; and the complained-of conduct constituted neutral reportage.

### B. The Second Complaint

On June 14, 2007, plaintiffs filed their second slander complaint against defendants. In a preliminary statement preceding the substantive allegations of the second complaint, the following appears: "This action was made necessary when the network willfully ignored copious evidence that [the arena's] fire protection systems function effectively and the arena is safe. [¶] The network received much of this evidence after it broadcast a deceptive and sensationalistic promotion for a news report about the purported inadequacy of [the arena's] fire protection measures. The promotion presented

viewers with stock footage of billowing smoke and leaping flames as it informed them that [the arena's] 'fire systems weren't working' and that 'smoke' 'kills people.' The conditions portrayed in the promotion have never existed at [the arena] and the likelihood that they could in fact occur is infinitely remote. Nevertheless, the promotion inculcated viewers with the false notion that visitors to [the arena] run a serious risk of succumbing to a deadly conflagration. [¶] KNBC etched that notion in stone when it aired its news report. In that report, KNBC and producer [Mr.] Snepp expanded upon the promotion's false message and further exploited viewers' fears by falsely asserting that [the arena's] smoke control system has never been tested and 'doesn't work.' They did not stop there: [Defendants] baselessly informed viewers that [the arena] 'is not safe to occupy.' Despite knowledge that the allegations in the promotional segment and the report were untrue, on May 17, 2007, defendants urged viewers to watch the 'original investigation' on KNBC.com."

The allegations in the second complaint concerning the parties' identities are the same as in the first complaint filed May 9, 2007. The heading above the claim for relief adverts to a May 17, 2007 Internet posting which refers to and expands on the December 19, 2006 news report. The second complaint then alleges in detail the untruths of the December 2006 broadcast. The December 19, 2006 broadcast was produced by Mr. Snepp and "moderated" by Mr. Moyer. The December 19, 2006 report began, " '[T]here are *new questions* about the safety of [the arena], questions investigated by [Mr.] Snepp and NBC4's Paul Moyer.' " (Original boldface and italics.) The broadcast continued: "At the outset of the News Report, Moyer stated: *'Now, six years later* [i.e. six years after [the arena] was opened to the public,] we can report, based on the City's own records, *that a critical component of the fire protection system at* [*the arena*]—*the smoke evacuation system—has never been fully tested or proven.*' " (Original boldface and italics.) Accordinging to the second complaint, Mr. Moyer's statement was false. In fact, the arena's smoke control system had been tested, was code compliant, and was fully operational.

After Mr. Moyer's lead-in, Alfred Babayans, described to viewers as an "engineer" who was in charge of checking construction plans for the arena for the Los Angeles building and safety department stated, " '[*I*]*f this* [*the 'smoke evacuation system'*] *doesn't work, it means the other components don't work, which means the building is not safe, period.*' " (Original boldface and italics.) The second complaint alleges Mr. Babayans's statement was false in three respects: it was false because it was predicated on Mr. Moyer's false statement the arena's smoke evacuation system had not been fully tested; in fact, the arena's smoke control system was fully

operational and code compliant and the facility was safe; and the "other components" of the arena's fire protection systems would not cease to function even if the smoke control system became inoperative. Further, defendants knew Mr. Babayans's statement was premised upon false or incomplete information.

Then the broadcast featured Randall Ackers, described as a former building and safety inspector. Mr. Ackers stated, " *'It isn't fire that kills people. It's the smoke.'* " (Original boldface and italics.) Then Mr. Moyers falsely stated that the arena's smoke evacuation system had received only partial approvals from the building and safety department. Mr. Moyer then asked Mr. Babayans, " '[I]f the smoke evacuation system has not passed a final test, what does that mean?' " Mr. Babayans responded to Mr. Moyer's question, " *'It means the building is not safe to occupy.'* " (Original boldface and italics.) Mr. Moyer's statement was false in that: as noted, the arena's smoke control system had been fully tested and had been approved in accord with the applicable building code; it misstated the contents of relevant records; and it misstated the code-mandated testing requirements for smoke control systems. Mr. Babayans's statement was false: as it was predicated on Mr. Moyer's untrue statements; the arena's smoke evacuation system was fully operational; and the arena was safe to occupy.

The second complaint further alleges in connection with the December 19, 2006 broadcast: "Viewed together in the context of the News Report as a whole, the above referenced statements send the false message that [the arena's] smoke control system has never been tested in accordance with the code, has never been proven to be operational and effective and that these conditions render [the arena] unsafe today. In truth and in fact, [the arena's] smoke control system was subjected to, and successfully completed, extensive testing and was determined to be code compliant and fully operational. There is no factual basis for the assertion that [the arena] is not currently 'safe to occupy.' The likelihood that visitors to [the arena] will succumb to smoke in a deadly conflagration is virtually nil." Additionally, the second complaint alleged the aforementioned statements were defamatory per se; the challenged statements exposed plaintiffs to contempt, hatred, and obloquy; and the statements had a tendency to injure plaintiffs' business operations and profits. The second complaint alleged: "Defendants intended viewers to understand that [the arena's] fire protection system currently does not work or is not in compliance with the building code that the owners and operators of the arena are aware of those conditions, that the arena is currently unsafe and that visitors to the arena are exposed to a high risk of succumbing to smoke in a deadly conflagration."

From December 11, 2006, until May 5, 2007, defendants were provided with "reliable information" that the arena's smoke control system had been successfully tested and was code compliant, fully operational, and safe. On May 17, 2007, "[d]efendants'" nightly broadcast urged viewers to watch the "original investigation" on KNBC.com. According to plaintiffs, this May 17, 2007 republication of the December 19, 2006 broadcast was done with malice and prior to filing the second complaint, they requested a retraction or correction. Plaintiffs sought general, special, and punitive damages. Attached to the second complaint is a compact disc video depicting the December 19, 2006 broadcast. No answer was filed to the second complaint as the parties were litigating the special motions to strike.

### III.  SPECIAL MOTIONS TO STRIKE

#### A.  Grounds

On June 13, 2007, defendants filed their special motion to strike the first complaint. Defendants asserted the causes of action arose from the exercise of their free expression rights pursuant to Code of Civil Procedure section 425.16, subdivision (e)(2) and (3). In the statement of grounds in the notice of the special motion to strike, defendants asserted that the two complaints must be stricken because the challenged communications were protected by Civil Code section 47, subdivisions (d) and (e) and the federal and state constitutional free expression provisions as the broadcast was a fair and true report of official proceedings and records, which benefited the public; the broadcast did not contain a statement of fact and the implication asserted by plaintiffs was unreasonable; nothing in the broadcast was false; the broadcast was not of and concerning plaintiffs; the second complaint was an improper amendment and the broadcast only mentioned the "quality of property," which could not support a defamation claim. On July 31, 2007, defendants filed their special motion to strike the second complaint. Defendants reiterated the previously asserted grounds for striking the first complaint as reasons to specially strike the second complaint. In addition, defendents asserted the second complaint amounted to an impermissible amendment and there were defects in the retraction demand.

#### B.  The Evidence

#### 1.  Overview

Both sides made substantial evidentiary showings. Included in the evidentiary showings were compact disc videos of the promotional segment, December 19, 2006 broadcast and May 17, 2007 posting on the station's

Web site. Also, both sides interposed evidentiary objections. All of defendants' evidentiary objections were overruled. Certain of plaintiffs' objections were sustained. The following summary of the evidence includes only those matters considered by the trial court.

### 2. The promotional segment

The promotional segment began with the printed text "(EXCLUSIVE STAPLES CENTER INVESTIGATION) TUESDAY AT 5 AND 11 PM" with a photograph of flames in the background against the KNBC logo. This was followed by these words and visual images which, as noted, are bracketed: "Tuesday at 5 and 11. From the Lakers to Springsteen. It's an entertainment mecca.

"[Announcer's voiceover against video of the Lakers playing and Bruce Springsteen in concert and then of people standing outside the arena to buy tickets or enter the facility]

"But when you go inside Staples Center are you safe?

"[Announcer's voiceover with video of exterior and interior of the arena]

"It isn't fire that kills people. It's the smoke.

"[Video of Mr. Akers being interviewed and an explosion and smoke fill the screen]

"Was Staples open for business before a critical fire protection system was proven?

"[Video of the interior of the arena and smoke control system fire doors, control panels]

"We knew that the fire systems weren't working.

"[Video interview of Greg Nelson]

"We never asked for any favors. We never cut any corners.

"[Video of Tim Leiweke interview]

"But Paul Moyer uncovers documents that will make you ask: 'What would really happen if a fire broke out?'

"[Announcer's voiceover, video of smoky interior ending with flames. The voiceover concludes:] 'Exclusive Staples Center investigation Tuesday on the Channel 4 news at 5 and 11.' "

### 3. The December 19, 2006 broadcast

The following is the December 19, 2006 broadcast. The identities of the persons who are speaking and the description of the visual images are bracketed.

"[Colleen Williams:]

"So we begin tonight at 5 with that major channel 4 news investigation. Staples Center. [Video of exterior of the arena in the background] It's been a beacon of light in the redevelopment of downtown Los Angeles drawing hundreds of thousands of people to concerts and sporting events every year. But tonight there are new questions about the fire safety systems at Staples Center. Questions investigated by producer [Mr.] Snepp and [Mr.] Moyer.

"[Mr. Moyer:]

"For the past year and a half we've been telling you a story that raises serious questions of safety involving the Playa Vista development next door to Marina del Rey. [Video of exterior of the arena] The L.A. Department of Building and Safety is a central character in that drama and it's making an encore appearance in the story we're going to tell you tonight. With the L.A. Fire Department playing a supporting role in our Staples Center investigation. [¶] It is the people's playground, where the rich and merely passionate gather to gaze upon greatness. But high above the arena, a sobering reality check. [Video of Lakers] Video instructions on how to evacuate the place in case of an emergency like fire. [Video of interior of the arena showing evacuation video on central ceiling monitors.]

"[Greg Nelson:]

"We knew that the fire systems weren't working.

"[Mr. Moyer:]

"Greg Nelson was aide to City Councilman Joel Wachs in early 2000. [Video of Mr. Wachs] Six months after Staples opened, at Wachs's initiative, the city council investigated Staples fire controls and reported, quote 'their fire systems are not operating.' [Photograph of March 15, 2000 Los Angeles City Council committee report]

"[Mr. Nelson:]

"There was a tremendous rush to get that arena open for the beginning of the Lakers and the Kings season. When we heard that the fire system wasn't

completely operable, we understood how that would be possible. [Video of interior construction of the arena]

"[Mr. Moyer outside the arena:]

"Remarkably the city council findings got very little attention. But now, six years later, we can report, based on the city's own records, that a critical component of the fire protection system at Staples, the smoke evacuation system, has never been fully tested or proven. [Interior video of the arena, Lakers and showing the smoke control system and central ceiling monitors where emergency evacuation videos are played.]

"[Alfred Babayans:]

"If this doesn't work it means the other components don't work, which means that the building is not safe, period.

"[Mr. Moyer walking outside with Mr. Babayans:]

"Alfred Babayans, now a private engineer, was in charge of checking construction plans for Staples and the L.A. Department of Building and Safety. [Photograph of plan check for Building and Safety] He says his then boss, Andrew Adelman, [video of Mr. Adelman] pushed hard to get the arena up and running and told his staff 'that this place should open no matter what. It means that you rubberstamp things, basically you ignore the safety standards.' [Video of people in the arena]

"[Mr. Leiweke:]

"We never asked for any favors. We never cut any corners.

"[Mr. Moyer interviewing Mr. Leiweke:]

"Tim Leiweke, president of Staples, insists he got no special treatment from city inspectors or officials. But the individuals involved in the matter told us that Mayor Richard Riordan's staff [video of press conference with Mr. Riordan and others] had fire inspector Monty Buckner [photo of Mr. Buckner] removed from the Staples project after Buckner refused to fast track inspections. [Interior of the arena] At about the same time, in October of 1999, Adelman's Department of Building and Safety [montage of fanned out documents] issued temporary certificates of occupancy, [temporary occupancy certificates] known as tco's, to allow Staples to open, unfinished so the games could begin. Handwritten tco notes show that virtually every important

safety inspection was deferred until later. [Photograph of documents with handwritten notes]

"[Mr. Snepp:]

"When they were issuing the tco's, was it safe or not?

"[Mr. Babayans:]

"No, it wasn't.

"[Mr. Moyer:]

"Fire Marshal Jimmy Hill [photograph of Mr. Hill] signed off on the tco's for the fire department. The actual fire inspector on the ground, Neal Reitzell, wrote in his log [photo of log] that the sign off was done without his concurrence and that fire protections were incomplete. [¶] [Video of Bruce Springsteen in concert] Bruce Springsteen opened Staples on October 17, 1999. [Video of crowds entering the arena] A fire department memo [photo of memorandum] had advised the mayor and his then deputy, now City Attorney Rocky Delgadillo, [photographs of mayor and Mr. Delgadillo] that fire protections were incomplete [photograph of document log] and that fire marshals would be in attendance at events as a stop gap measure. [Video of man wearing official badge]

"[Mr. Leiweke:]

"I remember Bruce Springsteen, he had a candle in his locker room on the night of his concert and we had to blow it out 'cause the fire marshals didn't want a candle lit.

"[Mr. Moyer:]

"And no wonder the fire marshals were so concerned, says former Building and Safety Inspector Randall Ackers who examined our Staples files. [Video of crowds outside the arena]

"[Mr. Ackers:]

"That building is nearly a million square feet and has an occupancy load of 22,000. I was a little surprised at reading that four fire watchers were going to be adequate to deal with the potential emergencies caused by a lack of a

smoke control system. [Video of Mr. Ackers reading "Staples Arena Inspection Analysis" report]

"[Mr. Moyer:]

"Fire Inspector Reitzell later wrote [video of Inspector Reitzell's signature on document] that the biggest obstacle to completing critical safety tests was Staples insistence on keeping the events going, nonstop. Leiweke complains that the fire department's inspections got in the way of business.

"[Mr. Leiweke:]

"Once we opened the building, they would have preferred we would have cleared everyone out of the building when they were doing their live safety checks and that wasn't going to happen. We were an operating concern. We had the Clippers practicing and playing. [Video of basketball practice] We had artists in there so there [video of rock artist] were times we had to restrict the testing.

"[Mr. Moyer standing outside the arena:]

"One of the critical fire protections for any large building is the smoke evacuation system, a combination of fire doors, ducts, dampers, fans, pressurized stairwells and other components that expel the smoke in case of fire. [Video of fire doors being tested, ducts, fans, dampers]

"[Mr. Akers:]

"It isn't the fire that kills the people. It's the smoke. [Video of fans]

"[Mr. Moyer:]

"If the components don't work in unison, experts say, the smoke settles into a deadly pall. [Video of ceiling and arena]

"[Mr. Akers:]

"Well you have people passing out from smoke inhalation, the building would fill quickly with smoke, blocking people's ability to see the exits and the exit signs causing panic. [Video of empty arena]

"[Mr. Babayans:]

"Put this all together and you will see a big catastrophe on hand.

"[Mr. Moyer:]

"According to this building and safety log [video of department log], components of the smoke evacuation system for Staples were installed and partially tested in late 1999 and early 2000, as the games continued. And constantly, the components received only quote partial approval from building inspectors. [Video of crowd inside the arena]

"[Mr. Babayans:]

"Something was always wrong. They tried to fix it many times.

"[Mr. Moyer:]

"Based on this fire department schedule, another round of tests began in February of 2000. They were special tests, known as performance or acceptance tests, mandated by city codes and conducted by special fire inspectors with the help of building and safety engineers. [Photographs of documents, logs] Running these tests is like putting the Lakers through their paces to see if all the players can pull together. If one player falters, the team falters. [Mr. Moyer outside the arena] Reitzell's own test notes show [photograph of highlighted note] one problem after another, especially with the fire doors [video of fire doors] right up to February 15, 2000. [Exterior view top of the arena] On that day, he issued a report [photograph of report] that indicated by an empty check off box [video of check off box circled in red] that the system had not passed its final test. Records from the Department of [photograph of document] Building and Safety tell the same story with inspectors giving only quote partial approvals to the smoke evacuation system right up to the 15th. There were no further entries, not then, not up to the present. [Photograph of document log]

"[Mr. Snepp:]

"If the smoke evacuation system didn't pass a final test, what does that mean?

"[Mr. Babayans:]

"It means the building is not safe to occupy.

"[Mr. Moyer:]

"[Video of document montage] Despite the incomplete smoke test results, Fire Marshal Jimmy Hill and building and safety engineers signed off on a

final inspection report on February the 15th. [Video of report] And a permanent certificate of occupancy [photo of occupancy certificate] was issued the next day. A fire department statement says all fire and life safety inspections met the applicable provisions of fire and building codes. [Video of fire truck and sirens] The safety of the general public or the Staples employees was never compromised. And Building and Safety Chief Adelman and his deputies [video of Mr. Adelman] tell us in a written statement the sign offs meant that all installation and testing of the smoke evacuation system were completed and approved by the appropriate inspector. But informed sources close to Hill and Reitzell say that Hill signed off on the Staples inspections without Reitzell's final input [photographs of Mr. Hill and Mr. Reitzell] and when Hill did talk to his inspector later, Reitzell told him there were many safety violations still outstanding. [Mr. Moyer outside Staples] This is supported by a fire department status report issued two weeks after the sign off. [Photograph of back of fire truck] It shows the smoke control system still had only a partial test rating with corrections still pending on it and many other fire safety systems. [Photograph of 'Staples Fire Life Safety Status' report] In addition, Reitzell wrote a blistering report [photograph of report] for city officials saying the inspection schedule established by the Department of Building and Safety and the arena contractors was not practical or achievable. There was not enough time allowed for re-testing deficiencies to meet the proposed certificate of occupancy.

"[Mr. Snepp:]

"One system doesn't work in the chain, is the whole chain broken?

"[Mr. Babayans:]

"It may cause for the whole system to fail that means yes, it's broken.

"[Mr. Leiweke:]

"We absolutely passed all of the tests as they were required by building and safety and the fire department to us otherwise they wouldn't have signed off on the certificate of occupancy. [Photograph of occupancy certificate.]

"[Mr. Moyer:]

"Inspector Reitzell, Neal Reitzell, you're familiar with him, 'Yes,' notes the fire doors are not yet certified or properly installed. That's the day the c of o was issued. That's not final approval.

"[Mr. Leiweke:]

"Well, we had final approval from his boss and we've been told now by Chief Hill there was miscommunication within their department.

"[Mr. Moyer:]

"[Video of building and safety department documents] It's this miscommunication plus poor building and safety paperwork says Leiweke, that caused all the confusion. [Photograph of Mr. Reitzell] He also dismisses Reitzell as one particular gentleman, who, by the way, has a disagreement with his boss, they got to have a better system so they don't have people within their own ranks disagreeing with the chief. [Video of Mr. Leiweke and Mr. Moyer.]

"[Mr. Moyer:]

"So you're telling me that they messed it up, you didn't.

"[Mr. Leiweke:]

"Everything we were told we had to do, we not only complied with over a six month period of time, but they would not have signed off on that certificate of occupancy had we not finished every test to their satisfaction.

"[Mr. Moyer:]

"Didn't you know at the time the [occupancy certificate] was issued, there was a flaw in the system?

"[Mr. Leiweke:]

"No.

"[Mr. Moyer:]

"A note from Reitzell tells a different story. A day after the [occupancy permit] was issued, Reitzell wrote, 'The arena owners have agreed to provide qualified personnel to monitor the fire control room functions until the central station dialer, a direct link to the fire department, is installed in order to get the fire marshal to sign off on the CO.' [Photo of document with quote highlighted] [¶] In other words, Staples negotiated with the fire department to get the final certificate despite the incomplete fire system. [Exterior view of the arena; video of Bono]

"[Mr. Leiweke:]

"We have a fire marshal at every event we do in this building. We were the most heavily scrutinized building and arena I've ever been a part of and our company manages 30 or 40 of these arenas all over the world. We are one of the few arenas I know of that had to have such an extensive sprinkling system.

"[Mr. Moyer:]

"[Video of Mr. Moyer outside the arena] About that sprinkler system. The building department says its sign off of Staples certificate of occupancy verifies the sprinklers were completed and approved. But we discovered building and safety documents that show no final approval even now, for more than a thousand sprinklers at the arena leaving open the question, are they properly inspected and installed? [Video of documents, superimposed on arena footage]

"[Mr. Leiweke:]

"We're the safest building in any arena I know anywhere in the country and our experts and our consultants verify that.

"[Mr. Moyer:]

"[Video of control panels] Every year, Staples' own consultants test hundreds of components of the fire system and the fire department performs a single walk through inspection [video of occupied arena] with little follow up because the head of the inspection unit says he lacks the necessary manpower.

"[Mr. Leiweke:]

"We always have a problem with some components within the system and you know what those are? A burned out light bulb, an exit sign that may have been twisted, an exit sign that wasn't properly lit.

"[Mr. Moyer:]

"Not quite. [Video of montage of documents] Staples' own consultants have identified recurring problems with components of the smoke evacuation system and in any case, says former building inspector [video of Mr. Akers] Randall Akers, these private inspections and the fire department walk throughs all known as Reg 4 [photo of document] inspections are no substitute for the special test required to determine if the smoke control system is workable as a unit. [Video of component]

"[Mr. Akers:]

"[Video of interview] Those tests require temporarily shutting down the use of the building. And that's not what they do on the annual inspections.

"[Mr. Moyer:]

"Despite our repeated requests, the fire department declined to let us interview Chief Hill or Neal Reitzell. Building chief Andrew Adelman also declined to comment. [Video and photographs of a fire truck, Inspector Reitzell, Mr. Adelman, and Mr. Hill] In response to our public records requests, building and safety gave us a packet of Staples' inspection documents that excluded much of the information we've referred to in this story. [Video of packet of documents] Information we had to find on our own. The fire department initially told us they had lost their Staples files. [Video of Mr. Moyer outside the arena] Two days later, Assistant Chief Doug Berry called to say he'd found the files and invited us to examine thousands of them, [video of press conference] including Reitzell's notes. Berry has since been appointed acting fire chief. He declined to be interviewed. [Photographs of documents] [¶] Former city counsel aid, Greg Nelson, thinks the moral to this story is clear.

"[Mr. Nelson:]

"[Video of Mr. Nelson reading a document log and being interviewed] What I am seeing is fat cats and juice and influence being used in a situation that if something goes wrong, thousands of people could die and that is beyond alarming, that is absolutely inexcusable.

"[Mr. Moyer:]

"[Standing in front of montage of photos of Inspector Reitzell, Mr. Adelman, Babayans and others.] One final note about some of the players in this story. Fire Inspector Neal Reitzell was recently named fire marshal of the year. Building Superintendent Andrew Adelman is facing questions from the city controller about his department's failure to complete thousands of safety inspections around the city. His one time employee Alfred Babayans, was fired for allegedly not reporting outside business interests. He is appealing now, claiming the firing was in retaliation for his reporting of alleged sexual harassment by another building and safety employee. Tim Leiweke assures us he'll fix any flaw that's [photograph of Mr. Leiweke] found in the Staples fire control system. I'm Paul Moyer, Channel 4 news.

"[Ms. Williams speaking from the newsroom:]

"Today we were contacted by a building and safety official who said that quote housekeeping problems end quote, may have prevented complete record keeping in the Staples case. This same official, however, offered no specific evidence to support the possibility that inspections or approvals occurred other than those reflected in their records. And at the same time, that the department is using the same records in an ongoing city audit of incomplete safety inspections throughout the city of Los Angeles. We also heard again from the Staples Center which wanted to say again that it is perfectly safe and that its fire safety systems work.

"[Chuck Henry:]

"Departing Los Angeles Fire Chief William Bamattre had this to say about our investigation at his retirement ceremony today.

"[Chief Bamattre:]

"You're wasting your time, there is nothing there in the story. We built, worked the city entirely together to build Staples pavilion. It's a monument to how good departments and the city and private industry can work together. There's . . . I don't know what you're drumming up on issues around special treatment or anything but what you need to look at is how we treat everybody in the city of Los Angeles.

"[Mr. Henry:]

"You'll be hearing more from Chief Bamattre about his final day in office coming up a bit later in this newscast. We will of course continue our coverage of the Staples Center investigation and later tonight you will be able to see documents from both sides online on our web site. Just go to NBC4.tv and click on Staples Center Investigation."

4. May 17, 2007 posting on the station's Web site

"[Ms. Williams:]

"Now to a Channel 4 News investigation. Concerns about a flaw in the fire safety system at Staples center. Paul now has the latest in our 8-month long investigation. Paul.

"[Mr. Moyer:]

"Colleen, last December we aired the first installment of an ongoing investigation of the fire protections at the Staples Center. Documents we

uncovered at that time raised serious questions about whether the all important smoke control system had been fully tested when Staples got its final safety certificate from the city back in early 2000. Since that broadcast, new sources have come forward now with new disclosures. [¶] On June 10, 2006, this fire station [video of exterior of Fire Station No. 10] in downtown Los Angeles responded to an alarm [exterior of Staples Center] at the Staples Arena [exterior of the arena]. According to fire department records [documents displayed], a small fire had erupted in the McDonald's stand, on the third floor, upper concourse [handwritten document displayed]. By the time the firefighters had [exterior of red flashing light] got there, the fire was out. But it was a reminder of how important [Life Safety Net 2000 display] Staples' fire protections [photo of control panel] are.

"[Mr. Leiweke:]

"We've never had any issues in this building that put anybody in harm's way.

"[Mr. Moyer:]

"Tim Leiweke [video of Mr. Moyer and Mr. Leiweke] is president of the Staples Center. In an interview for our original Staples report last December, he stated repeatedly [tape of December interview] that when city officials granted the arena its certificate of occupancy in February of 2000 [certificate of occupancy document], they were effectively verifying that [exterior of the arena] all fire protections there had been properly [interior of the arena] tested and proven effective [exterior of control panel].

"[Mr. Leiweke:]

"Building and safety would not sign the certificate of occupancy unless our systems were in compliance.

"[Mr. Moyer:]

"L.A. fire and building officials [exterior of Los Angeles Fire Department signage] issued written statements supporting Mr. Leiweke's position. But soon after our broadcast we got a dissenting call from this interested viewer [film of Mr. Moyer with an unidentified man].

"[Bob Flores:]

"At the time that we did the inspections, there was a significant safety issue.

"[Mr. Moyer:]

"Bob Flores is an [film of Mr. Flores in a house] internationally known fire door safety expert [photograph of fire door] who worked for a testing company hired by [interior of the arena during construction] a Staples subcontractor during construction. His job, to make sure the fire doors were installed [film of two large doors closing] according to national and local fire safety codes. He says he informed city fire officials just before the certificate of occupancy was issued that many of the fire doors were not properly installed.

"[Mr. Flores, standing outside of the arena:]

"Either they were missing particular pieces of hardware or they had the wrong hardware on.

"[Mr. Moyer:]

"These documents [photos of official documents] prepared at the time by his employer, the testing company [Warnock Hersey letterhead displayed] Warnock Hersey, show the problems he detected in the fire doors. [Photograph of document]

"[Mr. Flores, standing outside of the arena:]

"Many of them had margin issues meaning that the gap between the edge of the door and the edge of the frame was in excess of what's permitted by the standard. They were so far offset from each other the doors wouldn't close and latch.

"[Mr. Moyer:]

"So what effect would these faulty fire doors [photograph of diagram on form] have in the event of a fire here at Staples Center?

"[Mr. Flores, standing outside of the arena:]

"Well if they don't close and latch, I'm not sure that you'd be able to get out safely because of the movement of smoke through the building or possibly even fire through the building.

"[Mr. Moyer:]

"So serious were these allegations, we asked Flores to return to Staples to re-examine the fire doors. Three times [film of Mr. Flores with a man in wheelchair inside the arena] in as many months, he visited the arena, twice with cameras which he took in through Staples security. He also prepared sketches of what he saw, which included [film of Mr. Flores with documents] fire doors on the main and upper levels [film of fire doors].

"[Mr. Flores:]

"What I saw there was the same conditions with margins between the pairs of doors, doors that didn't align properly and doors that wouldn't latch. [Pointing to photo of fire doors.] You could literally see right between the pairs of doors [video of doors]. For smoke control, they wouldn't work at all.

"[Mr. Moyer:]

"This fire door we photographed for our first broadcast at Staples' invitation. [Video of open fire doors, which then close.] Though Flores wasn't on hand to view it, he says the video shows imperfections.

"[Mr. Flores, viewing a photo of the doors:]

"We can clearly see the margin is large here, here, and here. You can see it clearly didn't latch [video of doors not aligned]. The top is still offset away from the top of the other door.

"[Mr. Moyer:]

"Flores says the fire door problems he observed would make it impossible to fully test [interior video of the arena] and verify the effectiveness of Staples' [photo of a document depicting a diagram] smoke control system. That collection of fire doors, dampers, ducts, fans and pressurized stairwells designed to contain and expel smoke and save occupants from suffocating in the event of fire [photos of ducts, fans, stairwells]. [Exterior view of Mr. Moyer interviewing Mr. Flores] You could not do a full acceptance test of the smoke evacuation system with those doors in the condition you found them?

"[Mr. Flores:]

"No, you could not.

"[Mr. Moyer:]

"You could not.

"[Mr. Flores:]

"No.

"[Mr. Moyer:]

"To check Flores' findings and conclusions we consulted experts [video of Mr. Moyer and a man] like Les Townsend, former Chief Deputy Fire Marshal for the State of Washington, now a private fire safety consultant and fire codes expert who's [Chief Deputy Chief Townsend unfolding blueprint plans] worked all over the country, including Southern California. [Video of Chief Deputy Townsend being interviewed by Mr. Moyer] How important are fire doors to the smoke evacuation system?

"[Chief Deputy Townsend:]

"Fire doors are an integral part. When smoke control systems start to activate, certain doors have to close to compartmentalize the building and the area to keep the fire and smoke from spreading to noninvolved areas. [Video of fire doors]

"[Mr. Moyer:]

"[Video of bottom of fire doors] He agrees that given the fire door problem Flores observed [photograph of plan map], Staples smoke control system couldn't have passed the acceptance test required for a certificate of occupancy [photograph of certificate of occupancy]. All the elements, the components of that system have to pass.

"[Chief Deputy Townsend:]

"Yes.

"[Mr. Moyer:]

"They all depend on one another, do they not?

"[Chief Deputy Townsend:]

"Correct. That's correct. It's all inter-tied as this one single—many components inter-tie to one single system.

"[Mr. Moyer:]

"Townsend [interior of Staples arena] says if the smoke control system, including the fire doors, had passed an acceptance test the safety code requires, [photograph of document and fire doors] the final progress report [would] be prepared by independent inspectors after installation. In our interview with Tim Leiweke [video of interview between Mr. Moyer and Mr. Leiweke], we asked him if he knew of such a report. He referred us to the fire department [photograph of fire truck with insignia 'Los Angeles Fire Department'] and to Fire Inspector Neal Reitzell who worked at Staples [photograph of Inspector Reitzell]. Where's his report?

"[Mr. Leiweke:]

"Well, you're going to have to ask them that. . . . I don't . . . .

"[Mr. Moyer:]

"There is no report. Leiweke has declined to be re-interviewed for this broadcast. [Video of documents thrown down on a surface] Instead, he has had Staples lawyers shower us with letters attacking the reliability of our producer [photograph of Mr. Moyer and Mr. Snepp], our sources [photograph of Mr. Akers and Mr. Reitzell] our consultants, even Inspector Reitzell. In one letter, the lawyers claim that their own hired fire safety expert and engineer named Mike Dillon, has inspected a significant number of fire doors and frames at Staples [photograph of plaintiffs' lawyers' letter] and found them fully functional. They say Dillon can find no basis for characterizing the arena as unsafe [photograph of quoted letter]. But throughout all of this, the lawyers have refused to let us interview Mike Dillon. [Silhouetted photograph of a man] They also sent us this binder [photograph of white binder titled 'Staples Center Smoke Control Special Inspection Report' which they say documents a complete and successful acceptance test [photograph of document 'summary of test results'] done on Staples' smoke control system, including [video of fire doors] its fire doors in late 1999. They quoted Dillon as saying, [photograph of letter] 'Nothing in those documents leads me to conclude that Staples Center is currently unsafe.' We asked Chief Deputy Townsend [video of Chief Deputy Townsend reading reports in binder] and other experts to examine the binder. [Video of pages of the binder.] They all reached the same conclusion: that this is a snapshot of incomplete tests done on an incomplete smoke control system, only partially compliant [closeup of documents] with the codes many months before the certificate of occupancy.

"[Chief Deputy Townsend:]

"There was no mention of any of the doors operationally, if the doors operated properly. There was never any mention or report that all the devices were tested. . . . [Photo of firedoors]

"[Mr. Moyer:]

"In addition, [closeup of document] we've uncovered fire department documents that show the alarm system and fire control [video of control panel] for the smoke control system had not been installed at the time this report was prepared. [Photograph of white binder entitled 'Staples Center Smoke Control Special Inspection Report'] If you have a fire control panel that is only partially [video of interview of Chief Deputy Townsend] operationally, not fully—

"[Chief Deputy Townsend:]

"Uh huh.

"[Mr. Moyer:]

"Can you conduct a full acceptance test of the smoke evacuation system?

"[Chief Deputy Townsend:]

"No.

"[Mr. Moyer:]

"Moreover, according to this Fire Department log [photograph of date log], over the next five months, right up to the certificate of occupancy, fire and building officials continued to investigate whether the smoke control system actually worked.

"[Mr. Leiweke:]

"That entire time, they were testing, every day.

"[Mr. Moyer:]

"The day before the certificate of occupancy Fire Inspector Reitzell [photograph of Inspector Reitzell] issued his own final test report on the smoke control system. And indicated by an empty check off box that he had not given it a passing grade [photograph of empty check off box]. Instead he referred readers to his log notes in which he wrote, 'I spoke with Bob Flores

and he said most of the rated fire doors in the facility have been altered or improperly repaired and installed [photograph of log] and that he would not certify them as they are now.' You expressed that opinion?

"[Mr. Flores:]

"Absolutely. In writing.

"[Mr. Moyer:]

"You said 'I would not certify these fire doors.'

"[Mr. Flores:]

"Absolutely.

"[Mr. Moyer:]

"In writing.

"[Mr. Flores:]

"In writing.

"[Mr. Moyer:]

"Meanwhile, according to this permit, [photo of Permit Application or Issued Permit Information document] building officials ran final tests on components of the smoke control system and gave them only partial approval. [Photograph of document depicting PARTIAL APPROVAL.] Even so, the following day, February 16, 2000, the city signed off [photograph of certificate of occupancy] on Staples certificate of occupancy, verifying that all fire life safety systems were proven effective. [Exterior view of the arena's roof.] We asked the former chief deputy fire marshal for the State of Washington, how could that happen?

"[Chief Deputy Townsend:]

"It can happen if the city officials sign off on the c of o when they shouldn't have. That's how it can happen. Shouldn't happen that way. No way would it have happened if I was involved. I would never sign off on a smoke control system or recommend to the building official to sign off on the

c of o unless all of the life safety systems were up and running and it passed 100 percent of the certification and acceptance testing.

"[Mr. Moyer:]

"Townsend isn't the only cautionary voice.

"[Video of unidentified man:]

"This is an inspection problem.

"[Mr. Moyer:]

"Jake Pauls, a renowned expert on fire safety evaluations and evacuation procedures, [photo of Mr. Pauls with capitol behind him] says he finds the evidence we collected on Staples troubling. [Photo of interior and exterior of arena's sign]

"[Mr. Pauls:]

"There are various reasons for this. One being that doors are ill fitting or don't work the way they're supposed to and hence the smoke control would not work as well as it is supposed to. [Video of interior ceiling of Staples.] And secondly, there appears not to have been adequate testing or evaluation of the smoke control system.

"[Mr. Moyer:]

"[Video of Leiweke interview] Tim Leiweke admitted in his original interview, that he'd been eager in 1999 to get the arena up and running but he said that neither he nor the city shortchanged [video of crowds outside the arena] any of the required fire safety tests for Staples.

"[Mr. Leiweke:]

"No favors were asked for and we went through every standard test that any other building has to go through.

"[Mr. Moyer:]

"But this report [photograph of report], prepared by Inspector Reitzell in late February of 2000 [photo of document Staples Arena Inspection Analysis] states, 'The inspection schedule established by the Department of Building and Safety and the arena contractors was not practical. [Photograph of quote]

There was not enough time allowed for re-testing deficiencies to meet the proposed Certificate of Occupancy date.' [Exterior of the arena] Even now, seven years later, building and safety's computerized data base shows that many fire safety permits for Staples, including the one for smoke control components [video of document] still have only partial approval as their final inspection entries. The department says [video of letterhead] its behind in its data entry.

"[Mr. Flores:]

"It is clear that this door is not latched. You can see the offset from each other's face. We can see the light coming right through the bottom there as well. We can clearly see that the margin here is very large. [Video of fire doors with Mr. Flores pointing out margins]

"[Mr. Moyer:]

"In the last of his recent trips to Staples, [video of man in wheelchair outside the arena] Bob Flores was accompanied by wheelchair bound Richard Skaff, a former building inspector who has helped the mayor of San Francisco develop building standards to assist the disabled. [Video of Mr. Flores and Mr. Skaff in the arena by a fire door]

"[Mr. Skaff:]

"Would these doors protect me? Or a person with another type of disability or the general public. [Video of Mr. Flores and Mr. Skaff watching a video of fire doors.]

"[Mr. Flores]

"I couldn't tell you that this door would help keep you safe from migration of smoke or fire so to say they would protect you, no. I wouldn't go anywhere near that.

"[Mr. Moyer:]

"Bob Flores [photograph of Mr. Flores in background] tells us he filed a report with the city back in 2000, explaining his concerns about the fire doors. We filed a public records request asking the Department of Building and Safety for a copy of his report. They referred us to the fire department. We scoured Fire Department files for it and found no trace. [Photograph of illegible documents] Building and safety told us the labels placed on the fire doors by the manufacturer are proof the components are certified as code

compliant. Flores says that under [photo of the exterior of the arena] code requirements, once a fire door is fully installed, [photograph of interior shaft] if any part of it is damaged or installed improperly, it must be recertified by an independent inspector, like the testing agency he worked for at Staples in 1999 and 2000. [Photograph of Wernock Hersey label.] In their many letters to us [photographs of a stack of letters] Staples' lawyers emphasized that the smoke control test chronicled in the binder they sent us prepared in late 1999, represent the complete successful acceptance testing necessary for a certificate of occupancy. [Photo of various pages in binder] They do not explain why the city continued testing the smoke control system for the next five months. In one letter, Staples' lawyers [photograph of Inspector Reitzell] did acknowledge that Fire Inspector Neal Reitzell had conducted smoke control tests at Staples in early 2000, but they also claimed that Mr. Reitzell wasn't responsible for the smoke control aspects of the project. [Photograph of quote and Inspector Reitzell] The fire department declined to let us interview Reitzell or any other officer. Staples' lawyers also noted that Reitzell wrote the word 'completed' [photograph of handwritten words] on handwritten notes about the smoke control tests he ran. They claim this means the smoke control system was fully and successfully tested. Our experts take a different view. [Video of Chief Deputy Townsend reading documents.]

   "[Chief Deputy Townsend:]

   "You can fully test anything. Whether it passes or not, is a different story.

   "[Mr. Moyer:]

   "Recently Staples fire safety expert Mike Dillon contacted Bob Flores [photograph of Mr. Flores] and talked with him about the fire doors. In a follow up letter [letterhead of STROOCK] Staples' lawyers state, 'We have reason to believe that Mr. Flores never advised the network, KNBC, that Staples' fire doors present a hazard either by virtue of their design, installation or current condition.' [Photograph of quoted passage from letter.] Bob Flores tells us this is incorrect. And he sticks by the statements he made to us on camera."

### 5. Defendants' evidence

   The evidence in support of the special motion to strike was as follows. Mr. Snepp's declaration stated he was employed by the station and produced two reports on "fire-smoke-control system" at the arena that aired on December 16, 2006, and May 17, 2007. Mr. Snepp had previously produced an award-winning program that exposed "potentially disastrous environmental features," which threatened the safety of the Playa Vista development

in Los Angeles. Mr. Snepp stated the promotional segment described in paragraph 9 of the first complaint aired between December 15 and 18, 2006.

Prior to the broadcasts, Mr. Snepp submitted multiple California Public Records Act (Gov. Code, § 6250 et seq.) requests to the city's building and safety and fire departments. Mr. Snepp reviewed " 'Log #27' " which was executed by representatives of both the building and safety and fire departments. According to Mr. Snepp, the document, Log #27, dated January 28, 1998, set forth the requirements and procedures for acceptance testing of the smoke control system in the arena. Uniform Building Code section 905.15 sets forth pertinent standards for acceptance testing. Mr. Snepp further stated that Uniform Building Code section 905.16 prohibited issuance of an occupancy certificate unless the appropriate building official certified there had been full compliance with specified requirements. Fire Marshal Hill signed the temporary occupancy certificate on October 1, 1999, and the inspection record required for the occupancy certificate on February 16, 2000. The building and safety department "signed off" on both the temporary and final occupancy certificates.

But Mr. Snepp's investigation revealed that acceptance testing was not complete at the time the temporary and final occupancy certificates were issued. On October 1, 1999, Inspector Reitzell was assigned to the fire department's inspection team for the arena. On that date, Inspector Reitzell entered a log note which indicated three temporary occupancy certificate issues were incomplete including stair pressurization and smoke evacuation report tests. Inspector Reitzell's log notes also state that the temporary occupancy certificate was issued without "New Construction insp. Concurrence" by unspecified officials. On October 17, 1999, the arena opened with a concert.

On February 1 and 2, 2000, former Councilmember Joel Wachs introduced a motion which stated: the arena was operating under a temporary occupancy permit while the fire alarm system was being completed; in order to provide a safe facility, a minimum of six fire inspectors must attend all events; "[s]erious questions" had arisen whether this requirement was interfering with other fire department operations; there were questions as to whether the city was reimbursed for these additional costs; and the arena could have acted more quickly in finishing the alarm system. A fire department February 15, 2000 document entitled " 'Retrofit Fire Acceptance Checklist' " states that Inspector Reitzell refused to give a "passing test grade" to the " 'stair shaft pressurization' " and " 'smoke control' " systems in the arena. Mr. Snepp related: "Reitzell's handwritten notes on February 15, 2000 state that crucial components of the smoke control (aka evacuation) system remained incomplete and unproven. He wrote: 'swinging fire doors were not completed.

Some doors were being removed for repairs. Fire warning systems written procedures were not complete. There is still no approved monitoring system for the Fire Warning System.' "

On the same date, the building and safety department entered its final inspection entry. The entry in the building and safety department's records state that an inspector gave only "partial approval" to "a 'Test-Life SftyVent/Smoke/Air' " which involves "mechanical-ventilation" components of the smoke control system. On the next day, February 16, 2000, Inspector Reitzell wrote: "Re-inspected repaired fire doors. I spoke with Bob Flores of Warnock Hersey who represents the fire door manufacturer and he said most of the rated fire doors in the facility have been altered or improperly repaired and installed and that he would not certify as they are now, I told the contractors PCL of this and issued a correction to the arena engineers to have all such doors re-certified by the door manufacturer." Also, on February 16, 2000, Inspector Reitzell prepared a correction note which stated: " '[A]ll fire doors and frames in the arena that have been altered, repaired, shall be recertified by the manufacturers Warnock Hersey prior to the final approval by the Fire Department. Provide 24 hrs qualified personnel in the fire control room to monitor the fire alarm system and to take appropriate emergency action to notify the fire department until an approved central station monitoring systems is installed, tested and approved.' "

During late February 2000, Inspector Reitzell responded to the issues raised by Councilmember Wachs's aforementioned February 1, 2000 motion. Inspector Reitzell wrote: " 'The inspection schedule established by the Department of Building and Safety and the Arena Contractors was not practical or achievable in light of the time frames established and the enormity of the project. There was not enough time allowed for re-testing deficiencies to meet the proposed Certificate of Occupancy date.' " On March 1, 2000, two weeks after the occupancy certificate was issued, Inspector Reitzell, on behalf of the fire department issued a " 'Staples Fire Life Safety Status' report" which indicated as of that date the " 'Smoke Control System' " had received a only " '[p]artial' " " 'systems tested' " rating and the status of other "fire-life-safety-systems" including the " 'fire door assemblies' " indicated that "corrections" were pending.

On March 15, 2000, four weeks after the occupancy permit was issued, the council's public safety committee issued a report that discussed the matter raised by Councilmember Wachs's February 1, 2000 motion concerning the use of fire department personnel and whether the city had been reimbursed for those costs. The public safety committee report indicated: the city had been reimbursed for those costs as normally occurred; the money recovered was returned to the city's general fund; temporary occupancy permits are

"normal" in the case of "large developments"; the fire department related that a temporary occupancy certificate is never intended to be "long-term"; and the temporary occupancy certificate occupancy permit was issued in this case in order to permit the arena "to open and proceed with final acceptance testing for" its safety systems. While discussing this issue, the committee reported: "Because their fire systems are not operating, the [arena] is required to provide and pay for a 'Safety Watch.' Six inspectors are required to be on duty during events at the [a]rena to ensure that those areas where the systems are deficient are 'monitored.' "

### 6. Plaintiffs' evidence

Norman Hollyn, head of the editing track at the cinematic arts school at the University of Southern California received his Bachelor of Arts degree from Stony Brook University. Mr. Hollyn described the editing process thusly: "There is nothing accidental or unintentional in editing—shots are consciously used or omitted, music and sound is deliberately selected and placed, and scenes are put together in a deliberate order. Each decision is normally thought through and discussed. In many cases, multiple versions of a particular moment or scene are constructed and evaluated. By the time the process is completed, each decision has been thoroughly examined in order to best serve the desired storytelling points. In the case of the Trailer, the point is clearly to make people concerned about their safety when they visit [the arena]." Mr. Hollyn described the promotional segment as consisting of three parts: "The Trailer is divided into three very specific sections, with clear editorial delineations between them. In the first part (which runs approximately six seconds), the happy public face of the [arena] is shown. In the second part (which runs approximately 15 seconds), footage is shown that introduces the idea that [the arena] is unsafe. In the final part (which runs approximately nine seconds) the audience is told about a report by Paul Moyer that promises to discuss documents . . . that will make you ask, 'What would really happen if a fire broke out?' The piece ends with a graphic that shows the report's title, and the date and time of its airing." Mr. Hollyn then analyzed each portion of the promotional segment and editing techniques utilized by defendants.

Dr. Edward Finnegan is a linguistics professor at the University of Southern California. Dr. Finnegan systematically analyzed the language used in the December 19, 2006 broadcast. Dr. Finnegan concluded: "[T]he special news segment about [the arena] that was broadcast on December 19, 2006 . . . conveys a strong and unmistakable impression that [the arena] has had and continues to have fire safety problems that endanger the lives of patrons who enter the building. That message is articulated in various ways in the content of the broadcast as it is linguistically introduced, framed, and

developed. The broadcast's repeated use of certain phrases and expressions contribute to the overall impression, as does the effective juxtaposition of remarks by [Mr.] Moyer and others. Taken together, the language of the broadcast, including presuppositions made, effectively creates in the viewers an unmistakable impression of continuing danger even of death, at [the arena]. In my opinion, the message of such danger at [the arena] has been conveyed purposefully and deliberately by the language used in the segment."

Lee Zeidman, senior vice-president and general manager of the arena, declared that plaintiffs had received inquiries from business partners and customers after the December 19, 2006 broadcast. The customers and business partners inquired about the arena's safety. The fire sprinkler and pump systems are never turned off without notification of plaintiffs' insurance carriers. As soon as the equipment is returned to service, the insurance carriers are notified.

According to Mr. Zeidman, before every concert, a permit is "file[d]" for "temporary show power" and the city conducts an inspection. Further, the arena is the only facility where an emergency evacuation video is shown before every event. Also, Mr. Zeidman explained that every week: the arena's fire sprinkler shutoff valves are inspected to ensure they are open and the results sent by facsimile transmission to plaintiffs' insurance carriers; the fire pumps are tested and the results are logged; pursuant to city requirements, the emergency generators are tested and the results are logged as required by the city; and the four large " 'arena bowl' " smoke exhaust fans are tested and the results recently were logged. The arena "often" inspects all doors. Those which are damaged are immediately repaired or replaced.

Every quarter, all water flow switches are tested and the results are documented. According to Mr. Zeidman, every six months: the "pre-action sprinkler systems" are inspected; the "services" are inspected and the wet chemical extinguishing systems for cooking exhaust hoods are certified; medium voltage maintenance is conducted; and "all 4160 volt load break switches, the main vacuum bottle breaker, and all substations" are tested and serviced.

Annually, the arena undergoes a fire department highrise inspection as well as "Regulation 4" testing. Moreover, every year full- and part-time arena employees undergo emergency preparedness training. Every 18 months, arena staff and representatives of plaintiffs' insurance carriers conduct a detailed walk through of the facility. Deficiencies are corrected and suggestions are implemented immediately. Every three to five years, the emergency generator and fire pump cranking batteries are tested. Every five years, the sprinkler systems are tested. Finally, the emergency response plan is updated as necessary and distributed to all employees.

Retired New York City Fire Department Deputy Chief Richard C. Picciotto personally inspected the arena and conducted a review of the latest Regulation 4 inspection documentation. The documentation reflected the condition of the smoke control system including pressured stairwells, dampers, fans, and ducts. Further, Retired Deputy Chief Picciotto inspected the fire control system including: the fire control room; fire control panel; fire pumps; fire sprinklers; and fire doors. Retired Deputy Chief Picciotto declared: "[The arena] is exceptionally fire safe and poses no real risk of fire hazard to its patrons. Based on my extensive experience with public buildings and venues, I found the fire systems at [the arena] are extremely well designed and maintained." Retired Deputy Chief Picciotto's review of the Regulation 4 documentation confirmed the arena's safety.

Michael E. Dillon, a mechanical engineer, reviewed 44 distinct documents, which included the arena's "Smoke Control Special Inspection Report," which consisted of: an introduction; a project description; the smoke control design concept; the "Special Inspection And Acceptance Procedure"; a summary of results and conclusion; the "ME/Hayakawa and Associates' Letter of Compliance Certification"; and a series of appendices. The appendices described: the sequence of operations; the "ACCO/ABCO Test Results"; the "Rosendin/Firecom" test results; and a list of equipment and devices.

Mr. Dillon inspected the premises. Based in part on his own inspection, Mr. Dillon concluded, "The arena is equipped with a sound, functioning and adequate fire protection system and no component of that system renders the arena unsafe." In forming his opinion, Mr. Dillon relied on the results of the "Annual Regulation 4 Testing," which was required by the city and conducted by independent inspectors. The most recent Regulation 4 testing indicates the exiting systems, which includes fire doors, stairwells, and illuminated fire signs are fully functional; the fire alarms and sprinkler systems are fully functional; and the smoke control system is likewise fully functional. Mr. Dillon concluded: "[The arena's] smoke control system—the system of ducts, dampers, fans, pressurized stairwells, etc.—erroneously referred to in the News Report as the 'smoke evacuation system'—has been fully and successfully tested in accordance with code requirements and operates as designed. I base this opinion on information contained in the sources listed above, including information in the safety and inspection records that show that the smoke control tests prescribed by code had been performed and were successfully completed. Specifically, the 'operational' and 'capacity' tests specified in Log # 27 were conducted and the arena passed the tests. No other tests are required by any code or regulation. The records also show that the stairwell pressurization system had been successfully tested and that air balance tests had been conducted and completed. These materials reveal that the smoke control system was and is fully operational and equipped to perform as designed. In particular, the Smoke Control Report indicates that

the following systems and components were inspected and found to be satisfactory: smoke control sequencing, stairwell pressurization system, fans, ducts and dampers, and fire alarm and life safety system detection devices and smoke evacuation equipment." In terms of the current fire safety status of the arena, Mr. Dillon believed it is "currently safe" for occupancy during major sporting events and concerts. Mr. Dillon believed the smoke control system currently functioned properly.

After reviewing the aforementioned array of documents, Mr. Dillon indicated he could "say to a degree of certainty" that the arena's smoke control system functioned properly when the facility opened. Mr. Dillon disagreed with a number of assertions in the broadcast. For example, Mr. Dillon discussed defendants' assertion the arena "smoke evacuation system" had been given " 'only partial approval' " and had not successfully completed final testing. According to Mr. Dillon, Mr. Snepp relied on a " 'Retrofit Final Acceptance Checklist' " which is typically prepared in the course of "Code mandated 'acceptance testing' " which precedes the issuance of the occupancy permit. Mr. Dillon explained that the entry " *'completed on 2-15-00'* " (original italics and boldface) indicates the "Stair Shaft Pressurization Smoke Control System" was successfully accomplished. If a system does not pass an acceptance test, the failure is noted, the reason the system does not perform satisfactorily is noted, and the system is retested. Mr. Dillon discussed the reference in Inspector Reitzell's notes that "testing was not complete until February 2000," which was cited in Mr. Snepp's declaration. According to Mr. Dillon, this notation meant that testing was successfully completed on that date.

Also, Mr. Dillon disputed Mr. Moyer's statement regarding Inspector Reitzell's complaint that the arena management insistence on conducting events was an obstacle to completing critical safety tests. According to Mr. Dillon, in a complex as big as the arena, there is nothing unusual about fire system testing being delayed because of construction activities. Nor was it unusual for a temporary occupancy certificate to be issued pending the completion of final testing.

Moreover, Mr. Dillon disagreed with the report's suggestion there was a risk of the arena filling with smoke. Mr. Dillon stated that: the statement the components of the smoke control system will work " 'in unison' " was false; the failure of fire doors to work would not prevent fans from operating, and it is virtually impossible for a systematic breakdown to occur. Only a catastrophic event, such as a jet plane crashing into the arena could cause it to fill with smoke. Moreover, the area where the arena is occupied is very large and contains very little combustible material. Suffocation occurs only in compartmentalized buildings, not in the case of a large arena where the dilution factor is so great.

Finally, Mr. Dillon stated that building and safety records were not indicative of the testing that occurred in 1999 and 2000. Building and safety department employees do not actually conduct the testing prior to the issuance of the occupancy permit. Rather, " 'Special Inspectors,' private companies," which are independent of city government, actually conduct the "Acceptance Testing," which confirms the fire system is operational. The testing does not make the system operational. Mr. Moyer's reliance on the building and safety records to assert that Acceptance Testing was not completed was in error. According to Mr. Dillon, the Acceptance Testing was in fact conducted by the "highly regarded engineering firm" of M-E Engineers/Hayakawa Associates, which certified the results.

Deborah Drooz, one of plaintiffs' lawyers, attached a series of documents produced by defendants during the limited discovery process. Included in the documents are: a September 28, 1999 letter from M-E Engineers/Hayakawa Associates indicating the smoke control system in the arena was "in substantial compliance with the design intent and complies with requirements of the applicable code"; a building and safety department document indicating the fire safety system permit was issued on June 4, 1999, and the permit was "FINALED" on February 10, 2000, after 53 inspections; a letter from PCL Construction Services Inc. dated February 1, 2000, relating the progress of testing which indicated the results were consistent with those reported in late September 1999; and a February 8, 2000 memorandum from PCL Construction Services Inc. indicating the progress of testing. Also attached to Ms. Drooz's declaration was the certification prepared by Air Balance Co., Inc., dated March 6, 2000, which stated the project had been "balanced" in accordance with standard requirements.

Further, Ms. Drooz attached Inspector Reitzell's report, which stated fire department inspection started in July 1999 and was completed in February 2000; there was insufficient time to complete testing; testing required coordination with building and safety staff; four fire inspectors were assigned between the first event (Mr. Springsteen's concert) and February 10, 2000; and the "premature move in" of arena occupants "placed an 'extreme hardship' on the inspection team." Inspector Reitzell concluded: "The lessons learned from this project are old lessons that the Fire Department has encountered many times in the past. No building or portions of a building should be occupied prior to the building or that portion to be occupied having a complete approved and tested fire life safety system in accordance with Section 109 of the Uniform[] Building Code."

Also attached to Ms. Drooz's declaration were: a September 6, 2006 fire department "Equipment Performance Certificate," which indicated there were no defects in the elevators; an October 2, 2006 fire department document

entitled "Fire Pump Performance Test," which stated the fire pump room was very clean and in good operating condition; a memorandum dated November 16, 2006, indicating there only minor discrepancies as a result of testing by Atlantic Electric; and the November 25, 2006 results of the 2006 Regulation 4 testing. All of the deficiencies were corrected.

One document possessed by defendants indicated that during an August 22, 2006 inspection, it was discovered that the event level rear hallways quartz lamps needed to be relamped and an exit sign near the broadcast scoreboard was not lit. Another document indicated there were discrepancies discovered during the October 2, 2006 testing. A fire department equipment performance certificate stated the automatic fire sprinkler and "annual fire pump" were certified. But the "annual pre-action systems" were not certified due to various discrepancies. Also attached is a November 20, 2006 work order prepared by COSCO Fire Protection Inc. for "all labor, equipment, and material" to repair all discrepancies noted during the semiannual test of the preaction fire control systems. Further attached is a November 28, 2006 "technician's field report" for a company called Fire Service, Inc., which identified corrections that had been made and indicated that all Regulation 4 repairs were now complete.

In addition to documents produced by defendants, Ms. Drooz attached their special interrogatory answers. Special interrogatory No. 1 sought what public proceedings defendants were relying on as a basis for the defense the news report consisted of a truthful report of a public proceeding. The public official proceedings defendants were relying on were: plan checks, permits, and inspections maintained by the building and safety department between 1999 and 2006 on its Web site; specified documents viewed by Mr. Snepp relating to tests at the arena performed prior to the issuance of the February 16, 2000 occupancy certificate; and fire department files containing documents copied by Mr. Snepp reporting inspections of fire life and smoke safety systems concerning events between January 29, 1998, and March 27, 2000. The special interrogatory responses took the position that the documents produced to plaintiffs and those reviewed by Mr. Snepp were proceedings.

Also attached to Ms. Drooz's declaration was a December 4, 2006 letter from Tim Fikre, the group's executive vice-president and general counsel, to Paula Madison, the president and general manager of the station. According to Mr. Fikre, Mr. Snepp had misinterpreted documents relative to fire safety systems testing, which occurred prior to the issuance of the occupancy permit. Mr. Fikre's letter was responded to on December 7, 2006, by Jennifer S. Domintz, a legal affairs vice-president for NBC Universal. Ms. Domintz indicated that her client disagreed with many of Mr. Fikre's assessments. She wrote: "However, rather than engage in an extended exchange of letters, we

propose that the more productive and appropriate forum in which to discuss the issues you have raised is the interview of Timothy Leiweke, which I understand is scheduled for tomorrow morning. Please let us know who will attend that interview from [the arena] so that we can arrange for the appropriate counterparts to attend." Ms. Domintz's letter concluded: "Nothing contained in or omitted from this letter shall be deemed an admission by [the station] of any facts or a waiver of any rights, remedies or defenses of [the station] in connection with the subject matter hereof, all of which are expressly reserved."

In his December 15, 2006 letter, Barry E. Mallen, one of plaintiffs' attorneys wrote: defendants failed to adequately specify the sources of their information there was insufficient testing of the fire control systems prior to the issuance of the occupancy certificate; the promotional segment was "titillating and sensational" and "false"; the station had withheld documents or was misconstruing those reviewed by plaintiffs' attorneys; and the totality of the evidence demonstrates that the arena is safe and meets all regulatory requirements. Mr. Mallen further stated, "We have not had a fair opportunity to respond directly to the allegations of [the station's] purported sources, as neither the identity of those sources nor the exact content of their statements has ever been revealed to us." Mr. Mallen's letter contained a similar statement to that in Ms. Domintz's letter that nothing therein constituted an admission of fact or waiver of any rights.

On December 18, 2006, Ms. Domintz responded to Mr. Mallen's December 15, 2006 letter. Ms. Domintz described e-mail, telephone, and in person communications between Mr. Snepp and Michael Roth, the group's media relations vice-president. Further, in her December 7, 2006 letter, Ms. Domintz invited Mr. Fikre to submit any additional information he deemed appropriate and to speak directly with station employees. Ms. Domintz denied the report contained any unsubstantiated allegations and reiterated her view that the station had acted fairly and was committed to providing accurate reporting. Ms. Domintz's letter reiterated the fact nothing in her letter constituted an admission or waiver.

Also, on December 18, 2006, Mr. Mallen sent another letter to Ms. Domintz, which stated in part: "First, one of KNBC-TV's principal sources, Alfred Babayans, is a former Building and Safety employee who the City of Los Angeles has confirmed was terminated for cause. Contrary to assertions by Frank Snepp (who referred to Mr. Babayans as the 'head of plan check for Building and Safety on [the arena]'), officials of the Building and Safety department have informed us that Mr. Babayans was not involved in the [arena] plan check, permitting or inspection. [The station] can easily confirm this through Robert McReady, the Assistant Personnel Director of the City of

Los Angeles. Even if Mr. Snepp is merely conveying what has been represented to him by Mr. Babayans regarding his purported role in the [the arena] project, we fear that [the station] has very much been misled by the individual it is relying on as a key source for this story." Further, Mr. Mallen indicated that Mr. Babayans was involved in litigation with the city. Also, according to Mr. Mallen, building and safety department staff had indicated that it was not unusual for final "PCIS" entries to be delayed on projects as large as the arena and eventually all inspections were completed and permits issued. Finally, Mr. Mallen requested that the proposed report be delayed or rewritten. Mr. Mallen's letter contained the same statement that nothing therein constituted an admission of fact or waiver of any rights as in the prior letters.

On the morning before the December 19, 2006 broadcast, Mr. Mallen sent Ms. Domintz an e-mail. Mr. Mallen stated: the acceptance testing process was in fact completed; the testing of the arena's "fire life safety systems" including the "smoke evacuation system" occurred in late 1999 and early 2000; the arena's "fire life safety systems have undergone extensive on-going testing"; the arena's smoke evacuation systems had never failed to "function properly"; and the building and safety department had "signed off" on the sprinkler systems on February 11, 2000. Mr. Mallen stated his clients intended to pursue their legal remedies if the story did not accurately portray the facts.

On January 4, 2007, Barry B. Langberg and Ms. Drooz served a Civil Code section 48a, subdivision 1 retraction demand on Mr. Snepp, Ms. Madison, the president and general manager of the station, and Ms. Domintz. The letter begins, "This firm represents L.A. Arena Company." The letter refers to the December 19, 2006 broadcast and contains the following demand: "Pursuant to California Civil Code Section 48(a), demand is hereby made that NBC publish a complete and unequivocal retraction of the falsehoods contained in the December 19, 2006 broadcast and the preceding promotional 'teasers.' In order to be effective, the retraction must be aired within twenty-one (21) days of the date of this letter in substantially as conspicuous a manner as the offending broadcast." On May 15, 2007, Mr. Langberg and Ms. Drooz wrote another retraction demand which begins: "Yesterday, we learned that KNBC has announced its intention to air yet another broadcast concerning safety conditions at STAPLES Center. Upon receiving this news, we visited KNBC's website to search for a more detailed description of the forthcoming broadcast. When we did so, we made a disturbing discovery: KNBC has re-posted the transcript of its December 19, 2006 broadcast that it removed from the site following [the] January 4, 2007 demand for a retraction of the

broadcast's falsehoods." The May 15, 2007 retraction demand states, "Demand is hereby made that the network immediately remove the above-referenced transcript from its website." The May 15, 2007 retraction demand refers to the arena. But the May 15, 2007 retraction demand makes no reference to the group.

### 7. Defendants' reply evidence

Attached as part of defendants' reply was the supplemental declaration of Mr. Snepp. Mr. Snepp reviewed building and safety department property activity reports for the arena issued between March 18, 1999, and October 23, 2003. The reports indicate that in connection with sprinkler and related fire control systems only "partial" approvals or inspections had occurred. Mr. Snepp declared, "There is no indication in these reports that there was further inspection or an 'approved' entry by [the building and safety department] or any other government agency."

Mr. Snepp also requested documents pursuant to the California Public Records Act for the fire and building and safety departments. One category of documents Mr. Snepp sought pertained to "acceptance tests" at the arena. On November 15, 2006, the building and safety department responded to Mr. Snepp's request for acceptance testing documents thusly: " 'There are no documents responsive to this item in the Department's files. We suggest you direct this request to the Fire Department.' " Mr. Snepp also requested acceptance testing results for the arena from the fire department. The fire department did not provide Mr. Snepp any results of an acceptance test. Further, Mr. Snepp adverted to the document labeled Log #27, which stated that acceptance testing involved both operational and capacity tests. The document labeled Log #27 was signed by fire and building and safety department representatives.

Moreover, Mr. Snepp provided the smoke control inspection report prepared by Frank A. Stefan, which stated, "We have reviewed this report prepared by PCL dated September 29, 1999, and by personal knowledge and limited on-site observation, certify, to the best of our understanding, that the smoke-control system is in substantial compliance with the design intent and complies with the requirements of the applicable code."

### C. The Ruling and Filing of the Notice of Appeal

The trial court denied the special motions to strike the two complaints. The trial court ruled: the complaints arose from defendants' exercise of their free expression rights within the meaning of Code of Civil Procedure section 425.16, subdivision (b)(1); the report was not "of and concerning" plaintiffs;

the statements in the promotional segment and the broadcast were actionable defamation; and the promotional segment and the report were not privileged pursuant to Civil Code section 47, subdivisions (d) and (e). The trial court ordered the two complaints consolidated for purposes of trial. On March 18, 2008, defendants filed a notice of appeal from the order denying their special motions to strike.

## IV.   DISCUSSION

### A.   Special Motion to Strike Jurisprudence

■ Code of Civil Procedure section 425.16, subdivision (b)(1) states in part, "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Our Supreme Court has described the two prongs present when a special motion to strike is filed: " 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds that such a showing has been made, it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim.' (*Navellier v. Sletten*[ (2002)] 29 Cal.4th [82,] 88 [124 Cal.Rptr.2d 530, 52 P.3d 703].)" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 278 [46 Cal.Rptr.3d 638, 139 P.3d 30].) The parties agree that the two complaints arise from the exercise of defendants' free expression rights.

■ Therefore, the issue before us is the second prong of special motion to strike analysis: the probability of prevailing element. Our Supreme Court has held, "To establish a probability of prevailing, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment . . . .' " (*Soukup v. Law Offices of Herbert Hafif, supra*, 39 Cal.4th at p. 291; see *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056 [39 Cal.Rptr.3d 516, 128 P.3d 713].) In making a probability of prevailing assessment, a court evaluates the pleadings and evidentiary submissions of both parties. (§ 425.16, subd. (b)(2); *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733].) But as explained by our Supreme Court, we do not weigh the competing evidence: " '[T]he court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.' ([*Ibid.*]) In making this assessment it is 'the court's responsibility . . . to accept as true the evidence favorable to the plaintiff . . . .' (*HMS*

*Capital, Inc. v. Lawyers Title Co.* [(2004)] 118 Cal.App.4th [204,] 212 [12 Cal.Rptr.3d 786].) The plaintiff need only establish that his or her claim has 'minimal merit' (*Navellier v. Sletten, supra,* 29 Cal.4th at p. 89) to avoid being stricken . . . ." (*Soukup v. Law Offices of Herbert Hafif, supra,* 39 Cal.4th at p. 291, original italics.) Our Supreme Court has described the plaintiff's probability of prevailing obligation: "[Code of Civil Procedure section 425.16] requires only 'a minimum level of legal sufficiency and triability' (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 438, fn. 5 [97 Cal.Rptr.2d 179, 2 P.3d 27])." (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 738 [3 Cal.Rptr.3d 636, 74 P.3d 737].)

These principles have a unique application to the two complaints. The first complaint, filed May 19, 2007, relates to the promotional segment. The second complaint, filed June 14, 2007, involves the December 19, 2006 broadcast and the May 17, 2007 Internet posting. In terms of the second complaint, if plaintiffs have complied with their special motion to strike second prong duty to prove a minimum level of legal sufficiency as to the December 19, 2006 broadcast, then the special motion to strike must be denied assuming there is no other legal bar to its viability. This is regardless of whether there is any merit to plaintiffs' defamation claims as to the May 17, 2007 Internet posting. Because if plaintiffs met their second prong duty as to the December 19, 2006 broadcast, the special motion to strike the second complaint was correctly denied. In terms of the second complaint, much of the briefing involves the December 19, 2006 broadcast. Like the parties, we did not dwell upon the issues raised by the May 17, 2007 Internet posting except in the context of the retraction demand issue.

> B.  As to the Second Complaint, the Group Did Not
> Demonstrate It Suffered Compensable Injury

Defendants argue the defamation claim in the second complaint should have been stricken because the group failed to demonstrate it suffered any compensable injury. Defendants argue as follows. There are two plaintiffs— the group and the arena owner. After the promotional segment was broadcast, on December 18, 2006, Mr. Mallen, on behalf of *both* the group and the arena owner served a Civil Code section 48a, subdivision 1 retraction demand. Defendants do not contend the group was insufficiently identified in Mr. Mallen's December 18, 2006 retraction demand, which relates to the promotional segment.

After the December 19, 2006 broadcast, on January 4, 2007, a retraction demand was served by Mr. Langberg and Ms. Drooz. The January 4, 2007 retraction demand, which relates to the December 19, 2006 broadcast, begins, "This firm represents L.A. Arena Company, owner and operator of STAPLES

Center." The January 4, 2007 retraction demand makes no reference to the group. Likewise, the May 15, 2007 retraction demand, made in connection with the posting to the transcript of the December 19, 2006 broadcast on the station's Web site makes no reference to the group, only to the arena. No retraction demand was served in connection with the May 17, 2007 Internet posting. Thus, defendants assert the special motion to strike the *second* complaint should have been granted because the group was limited to the recovery of their special damages in the second complaint; special damages were not sufficiently pled in the second complaint with the requisite particularity and the group failed to adequately make a prima facie showing it sustained any special damages. Defendants' entire argument is premised on the assumption that the January 4 and May 15, 2007 retraction demands, which do not mention the group, were insufficient to permit it to recover general damages.

■ Civil Code section 48a, subdivision 1 requires a plaintiff, in order to recover general damages, to serve a retraction demand: "In any action for damages for the publication of a libel in a newspaper, or of a slander by radio broadcast, plaintiff shall recover no more than special damages unless a correction be demanded and be not published or broadcast, as hereinafter provided. Plaintiff shall serve upon the publisher, at the place of publication or broadcaster at the place of broadcast, a written notice specifying the statements claimed to be libelous and demanding that the same be corrected. Said notice and demand must be served within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous." (See *Di Giorgio Corp. v. Valley Labor Citizen* (1968) 260 Cal.App.2d 268, 274 [67 Cal.Rptr. 82].) Civil Code section 48a, subdivision 1 applies to television broadcasts. (Civ. Code, § 48.5; 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 629, p. 935.)

Our Supreme Court has identified various purposes of Civil Code section 48a, subdivision 1 retraction demand provisions. What is now Civil Code section 48a, subdivision 1 was originally adopted in 1931. (Stats. 1931, ch. 1018, § 1, p. 2034.) When adopted, it was part of a legislative trend restricting the right to recover defamation damages, which began in 1873. (*Werner v. Southern California Associated Newspapers* (1950) 35 Cal.2d 121, 124–126 [216 P.2d 825].) The potentially legitimate purpose of the legislative trend was to restrict perceived excessive general damage awards and protect the public interest in the free dissemination of news. (*Id.* at p. 126; see *O'Hara v. Storer Communications, Inc.* (1991) 231 Cal.App.3d 1101, 1110 [282 Cal.Rptr. 712].) Another purpose of Civil Code section 48a, subdivision 1 was described in *Kapellas v. Kofman* (1969) 1 Cal.3d 20, 30 [81 Cal.Rptr. 360, 459 P.2d 912]: "The Legislature enacted Civil Code section 48a to encourage

a more active press by means of an increased insulation of newspapers from liability arising from erroneous published statements. The statute represents a significant change from common law libel, which at one time permitted a plaintiff [libeled] even by an innocent misstatement to recover general damages without proving actual injury. [Citations.] Under section 48a an individual cannot recover anything beyond 'special damages' unless he shows that he has requested, within 20 days after learning of the publication, that the publisher correct the allegedly libelous material, and that the publisher has failed to do so. The section also provides that the request for correction must be made by 'a written notice specifying the statements claimed to be libelous. . . .' " (Fns. omitted.) In addition, a purpose of Civil Code section 48a, subdivision 1 is to facilitate a publisher's efforts to determine if the publication contains an error: "The purpose of the requirement for the described specificity is to facilitate the publisher's investigative efforts in determining whether statements in the initial article contained error and should be corrected. By designating the remarks that the objector considers libelous, a notice may enable the publisher to narrow the scope of his investigation." (*Kapellas*, at pp. 30–31; see *Gomes v. Fried* (1982) 136 Cal.App.3d 924, 937 [186 Cal.Rptr. 605].)

Plaintiffs assert that the failure to mention the group in the January 7 and May 15, 2007 retraction demands is not legally controlling at the special motion to strike stage. They argue the prior correspondence between the attorneys adequately advised defendants of who had been damaged. Further, plaintiffs rely on common knowledge the group owns the arena. Apart from these practical considerations, plaintiffs rely on the following language in our Supreme Court's *Kapellas* opinion: "[L]etters written to request retraction of a statement do not compose formal legal complaints; we cannot expect that they will conform to the niceties of common law pleading. In enacting section 48a the Legislature intended to afford publishers an opportunity to correct committed errors before subjecting them to liability; it did not intend to build technical barricades to recovery by the individual who had given notice sufficient to advise a reasonable publisher acting in good faith of the claimed error. The crucial issue in evaluating the adequacy of the notice turns on whether the publisher should reasonably have comprehended which statements plaintiff protested and wished corrected. (*MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536, 554 [343 P.2d 36].)" (*Kapellas v. Kofman, supra*, 1 Cal.3d at p. 31.) As can be noted, the cited language in *Kapellas* refers to the specificity requirement in Civil Code section 48a, subdivision 1. In terms of the *MacLeod* decision, it too involved a defendant's argument that the plaintiff did not adequately specify the statements claimed to be libelous as required by Civil Code section 48a, subdivision 1.

(*MacLeod v. Tribune Publishing Co., supra,* 52 Cal.2d at p. 553.) Both the *Kapellas* and *MacLeod* opinions found the retraction demands were sufficiently specific.

This case involves a materially different issue—the failure of the group, a parent corporation of its subsidiary named in the complaint, the arena owner, to be identified in the Civil Code section 48a, subdivision 1 retraction demand. Both sides offer persuasive analysis. But we conclude defendants have the better argument. For the following reasons, we conclude the failure to name the group in the January 7 and May 15, 2007 retraction demands required it to plead in the second complaint and make a prima facie showing that it sustained special damages. To begin with, Civil Code section 48a, subdivision 1 requires the *plaintiff* to serve the retraction demand. At the very least, that would suggest the plaintiff should be named in the demand. Contrary to plaintiffs' contention, the language in Civil Code section 48a, subdivision 1 requires the plaintiff to serve the retraction demand, not the plaintiffs' wholly owned subsidiary or a company known in the local community to own the party named in the retraction demand. Also, naming the potential plaintiff who is damaged furthers the judicially recognized legislative purpose of allowing the journalist to determine what needs correction. (*Kapellas v. Kofman, supra,* 1 Cal.3d at pp. 30–31; *Gomes v. Fried, supra,* 136 Cal.App.3d at p. 937.) If a potential plaintiff is not named in a retraction demand, the media defendant will be hard pressed to intelligently determine the necessity of or scope of any potential correction. Moreover, the purpose of Civil Code section 48a, subdivision 1 is to restrict a defamation plaintiff's right to recover general damages. (*Werner v. Southern California Associated Newspapers, supra,* 35 Cal.2d at pp. 124–126; *Fellows v. National Enquirer, Inc.* (1986) 42 Cal.3d 234, 241 [228 Cal.Rptr. 215, 721 P.2d 97].) Requiring the plaintiff to be identified in the retraction demand furthers that purpose. Our conclusion is consistent with areas of California law relating to prelitgation demands: government claims (Gov. Code, § 910 ["A claim shall be presented . . . and shall show all of the following: [¶] (a) The name and post office address of the claimant."]; *Nelson v. County of Los Angeles* (2003) 113 Cal.App.4th 783, 796 [6 Cal.Rptr.3d 650]); demand under Consumers Legal Remedies Act (Civ. Code, § 1782, subd. (a) ["Thirty days or more prior to the commencement of an action for damages pursuant to this title, the consumer shall do the following . . . ."]); and demand by depositor for return of deposit (Civ. Code, § 1823; *Hart v. County of Alameda* (1999) 76 Cal.App.4th 766, 777 [90 Cal.Rptr.2d 386] ["A depositor must demand the return of a deposit before he or she can prevail on an action to recover the deposit."]). Thus, in order for a valid Civil Code section 48a, subdivision 1 retraction demand to preserve the right to pursue general damages, the

plaintiff must be actually named or so described so that a media defendant fairly knows who is objecting to the challenged publication. Merely stating a wholly owned subsidiary is seeking a retraction does not preserve the rights of a parent corporation to pursue general damages.

■ Here, the group never served a legally effective retraction demand concerning the December 19, 2006 broadcast and the Internet posting. Thus, the group is limited to recovering its special damages in connection with the second complaint. Defendants argue no special damages were recoverable because there was insufficient pleading of a special damages claim nor was any evidence presented of such losses. Defendants are right on both counts. Special damages must be specially pled in a defamation case. (*Pridonoff v. Balokovich* (1951) 36 Cal.2d 788, 792 [228 P.2d 6]; *Gomes v. Fried, supra*, 136 Cal.App.3d at p. 939.) The damage allegations in the second complaint are: "As a direct and proximate result of Defendants' republication of the News Report, Plaintiffs have suffered damage to their reputations in an amount to be proven at trial. [¶] . . . Plaintiffs are informed and believe, and thereupon allege, that the conduct of Defendants was intentional, and done willfully, maliciously, with ill will towards Plaintiffs, and with conscious disregard for Plaintiff's rights. Plaintiff's injuries were exacerbated by the malicious conduct of Defendants. Defendants' conduct justifies an award of exemplary and punitive damages." These general allegations are insufficient to meet the specific pleading requirement. (*Pridonoff v. Balokovich, supra*, 36 Cal.2d at pp. 791–792; 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 934, p. 349.) Moreover, the group presented no proof of special damages. Thus, the group failed to comply with its second prong minimal merits burden imposed in a special motion to strike case. The motion to strike the second complaint filed June 14, 2007, should have been granted as to the group. Defendants are entitled to their attorney fees against the group incurred litigating in the trial court and on appeal whether the second complaint filed June 14, 2007, should have been stricken. (Code Civ. Proc., § 425.16, subd. (c); *Wanland v. Law Offices of Mastagni, Holstedt & Chiurazzi* (2006) 141 Cal.App.4th 15, 20–24 [45 Cal.Rptr.3d 633]; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1016–1020 [113 Cal.Rptr.2d 625].) The claims of the arena owner in the second complaint filed June 14, 2007, remain to be decided.

C.–G.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 598.

## V. DISPOSITION

As to plaintiff, L.A. Arena Company LLC, the order denying the special motions to strike is affirmed in its entirety and it shall recover its costs incurred on appeal from defendants, Frank W. Snepp III, NBC Universal, Inc., and NBC Subsidiary (KNBC-TV), Inc. As to plaintiff, Anschutz Entertainment Group, the order denying the special motion to strike the complaint filed May 9, 2007, is affirmed but the order denying the special motion to strike the complaint filed June 14, 2007, is reversed. Upon remittitur issuance, defendants shall recover their costs and attorney fees from plaintiff, Anschutz Entertainment Group, incurred in litigating the validity of the complaint filed June 14, 2007.

Armstrong, J., and Kriegler, J., concurred.

A petition for a rehearing was denied March 23, 2009, and on March 3, 2009, and March 23, 2009, the opinion was modified to read as printed above.